IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TYLER TREVATHAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 11-CV-0946-MJR |
| ) | |
| URS CORPORATION, ) | |
| URS CORPORATION, d/b/a URS ENERGY ) | |
| & CONSTRUCTION, INC., and ) | |
| URS ENERGY & CONSTRUCTION, INC., ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM and ORDER

REAGAN, District Judge:

On September 1, 2011, Tyler Trevathan filed a three-count complaint against Defendants URS Corporation, URS Corporation d/b/a URS Energy & Construction, Inc., and URS Energy & Construction, Inc., (collectively, URS) in the Circuit Court of the First Judicial Circuit, Pulaski County, Illinois. Served on September 23, 2011, URS timely removed the action to this federal district court on October 21, 2011, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446. Trevathan alleges that URS terminated his employment in retaliation for his exercising his rights under the Illinois Workers' Compensation Act (IWCA). Trevathan seeks compensatory damages (for lost wages, expenses and costs in seeking alternative employment, lost pension rights and fringe benefits, embarrassment and emotional damages) and punitive damages.

On August 15, 2012, URS moved for summary judgment; both a response and reply have been filed (Docs. 33, 53, 58). The matter being fully briefed, the Court begins its analysis with a recitation of the factual background.

I.   Factual Background

Trevathan, a member of the Ironworkers' Local 782 union, was employed by URS as an ironworker at the Olmsted Lock and Dam Project.  At Olmsted, URS constructed concrete precast shells which would be placed in the river to become part of the dam that is being built.  Part of Trevathan's job was to weld base plates to support posts so they could be attached to the shells.

It is undisputed that Trevathan was aware of URS's safety policies and procedures.  URS gave Trevathan safety material to review, provided him with a Safety Orientation Handbook which included URS's disciplinary policy for safety infractions.  The policy provided progressively more severe discipline for repeated infractions but also provided that "[a]ny blatant and/or willful disregard for safety can be cause for immediate termination regardless of the number of offenses."  (Doc. 34, Exh. A, p. 88).  The policy was effective as of January 7, 2002.  Trevathan received safety training in moving and picking up objects and using tools, as well as receiving the U. S. Army Corps of Engineers' Activity Hazard Analyses (AHAs), which cover various procedures for welding and other hazardous activities on the job.  The AHAs were reviewed and discussed at safety meetings.  Safety meetings were held each morning before employees began work.  Trevathan also received a copy of URS's "Sweet Seventeen Paths to the Gate" policy, which provided:  "Violation of any of the 17 safety rules listed will show you the path to the gate, thus preventing injury to you and our other Team Members.  <u>This will be Zero Tolerance!</u>  Together we can accomplish our goal of Zero Incidents!" (Doc. 34-3, p. 22) (emphasis in original).  The 17 violations listed included failure to wear fall protection, refusal or failure to wear protective equipment, being involved in horseplay

or fighting, any blatant or willful disregard for safety or AHA requirements and not stopping unsafe work after witnessing it. *Id.*

On August 18, 2011, Trevathan was welding base plates to the support posts, which are made of hollow steel pipe, about three inches thick.[1] The weight of the posts varies between 800 and 1800 pounds, depending on their length. The posts are capped on one end, and when Trevathan began working on a post, it would be standing vertically on the capped end. On the day Trevathan was injured, he was working with Ricky Larrison welding base plates. In order to move the post to the baseplate, Trevathan put a choker around the post, which attaches to the forklift with a picking device. The choker has two eyelets and is wrapped around the post. One end of the choker is pulled through the eyelet on the other end and tightened. The eyelet is hooked onto the picking device so that the forklift can lift the post and lay it on the ground. Once the post is on the ground, the choker is removed and put on the opposite end of the post so it can be lifted, and the uncapped end can be set onto the base plate for welding.

Trevathan and Larrison were working on their fourth support post when the injury occurred. The first three were moved by the forklift operator that Trevathan and Larrison usually worked with, Mike. Mike used the process described above when flipping the posts: picking up the post with the choker and laying it down on its side, and picking the post back up with the choker on the other end to set it on the base plate. Trevathan testified that when flipping a post, it is preferable to lay it down on the ground so that both gussets are touching the ground because that is the most secure position. The forklift operator who assisted with the fourth post was Ben Bolin, who had not flipped a support post for Trevathan before. Trevathan told Bolin how to flip the post, but Bolin suggested that he just knock the post over with the forklift instead of picking

---

[1] The Court accepts URS's version of these events and procedures to the extent that they are undisputed and supported by deposition testimony.

it up and laying it down. Trevathan told Bolin that he did not see what that would hurt and that it was okay to do it that way.  When Bolin knocked the post over, it fell on its side in the gravel and one of the gussets stuck in the gravel with the other gusset up in the air.  Trevathan and Larrison moved the choker so the post could be lifted, but, in doing so, a kink developed in the chain.   Trevathan "jerked" the choker to get the kink out and, since the post was balanced on only one gusset, it rolled towards him, onto his right foot, first scraping his shin and then landing on his ankle, driving his heel into the ground. He was able to pull his foot out from under the post.  Trevathan testified that he did not notice that both gussets were not on the ground before the post moved.

Larrison, Bolin and Dave Hill (general foreman) filled out accident reports before Trevathan was driven to the hospital by a Safety employee.  An investigation of the accident ensued, and management decided that Trevathan and Larrison should be discharged.  Trevathan was discharged on August 19, the day after his injury.  He filed for workers' compensation benefits on August 25.

II. Summary judgment standard

Summary judgment should be granted when "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  **Bevolo v. Carter**, **447 F.3d 979, 982 (7th Cir. 2006),** *quoting* **Fed. R. Civ. P. 56(c), and** *citing Ezell v. Potter***, 400 F.3d 1041, 1046 (7th Cir. 2005), Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).**

In assessing whether summary judgment is warranted, the Court must construe all evidence, plus the inferences reasonably drawn from the evidence, in the light most favorable to the non-moving party.  ***Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007)**, *citing Leaf v. Shelnutt*, **400 F.3d 1070, 1078 (7th Cir. 2005).**  The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion.  ***Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986);** *Salvadori v. Franklin School District,* **293 F.3d 989, 996 (7th Cir. 2002).**  Rather, to successfully oppose summary judgment, the nonmovant must present definite, competent evidence in rebuttal.  *Salvadori,* **293 F.3d at 996,** *citing Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, **278 F.3d 693, 699 (7th Cir. 2002).**

III.    Discussion

Trevathan claims that he was discharged in retaliation for exercising his rights under the IWCA.  Under Illinois law, "[t]o maintain a claim for retaliatory discharge, an employee must prove: '(1) his status as an employee of the defendant before injury; (2) his exercise of a right granted by the Workers' Compensation Act; and (3) a causal relationship between his discharge and the exercise of his right.'"  ***Gordon v. FedEx Freight, Inc*. 674 F.3d 769, 773 (7th Cir. 2012)**, *quoting Roger v. Yellow Freight Sys., Inc.,* **21 F.3d 146, 149 (7th Cir. 1994)**.  URS does not dispute that Trevathan was an employee before his injury and that he exercised a right guaranteed by the IWCA.  The only issue is whether Trevathan can establish that a causal relationship exists between his exercise of this right and his termination.

Illinois courts treat a retaliatory discharge action as a traditional tort claim, and so do not apply the familiar *McDonnell Douglas* analytical framework.  *Gordon,* **674 F.3d at 774,** *citing McDonnell Douglas Corp. v. Green,* **411 U.S. 792 (1973);** *O'Leary v. Accretive Health,*

*Inc.,* **657 F.3d 625, 630–31 (7th Cir. 2011);** *Clemons v. Mechanical Devices Co.*, **704 N.E.2d 403, 407-08 (Ill. 1998)**. As a result, in order to demonstrate a causal relationship, Trevathan "must affirmatively show that the discharge was primarily in retaliation for his exercise of a protected right." *Roger,* **21 F.3d at 149**. In sum, he must offer "sufficient evidence from which a reasonable jury could infer that the employer was improperly motivated." *Id.* If Trevathan can meet this burden, then URS is required to provide a legitimate reason for its decision to terminate him. *See id*. The ultimate issue in a retaliatory discharge case is the employer's motive in discharging the employee. *Hartlein v. Ill. Power Co.,* **601 N.E.2d 720, 730 (1992).**

URS's assertion that Trevathan failed to present evidence to show that URS discharged him because URS believed that he had filed or intended to file a workers' compensation claim is meritless. The Seventh Circuit, in *Gordon,* identified three ways recognized in Illinois law by which an employee may exercise a right under the IWCA: (1) where an employee files a workers' compensation claim; (2) where an employee is preemptively fired to prevent such a filing; and (3) where an employee merely requests and seeks medical attention. **674 F.3d at 77**.

The Illinois Supreme Court, discussing this third approach in *Hinthorn v. Roland's of Bloomington, Inc.,* **519 N.E.2d 909 (Ill. 1988)**, observed that "the overriding purpose of the Act is to protect injured employees by ensuring the availability of medical treatment, by shifting the financial burden of such treatment to the employer." **519 N.E.2d at 913 (citations omitted)**. The Court explained that the defendant confused procedural means with fundamental policy, noting that "[r]equesting and seeking medical attention … is only the crucial first step in exercising rights under the Workers' Compensation Act." *Id*. The Court

concluded that an employee who was discharged after informing her company that she had been injured and intended to seek medical attention had a claim for retaliatory discharge. *Id.* **at 910-13**.

Trevathan had no need to inform URS that he was injured and seeking medical attention. URS was immediately aware of it, and a URS employee drove Trevathan to the hospital. So, even though Trevathan filed a workers' compensation claim after he was discharged, he may still pursue a retaliatory discharge claim. By seeking medical care, Trevathan exercised a right under the IWCA.

URS next contends that Trevathan cannot establish causation because the reason for his discharge is valid and non-pretextual. Specifically, according to URS, Trevathan was discharged because he violated Rule 16 of the "Sweet Seventeen" – "willful or blatant disregard for safety or the requirements of the AHA's." URS's assertion is well-supported since Trevathan was trained in safety requirements, knew that URS had a zero tolerance safety policy, knew how to turn the post safely, turned the post in an unsafe manner and was injured thereby. So, URS has offered a legitimate, non-discriminatory and non-retaliatory motive for his discharge.

Once a defendant articulates a legitimate reason for the discharge, the burden shifts back to the plaintiff to show that "the employer's reason is unworthy of belief." ***Gusewelle v. City of Wood River*, 374 F.3d 569, 575 (7th Cir. 2004),** *quoting **Koski v. Standex Int'l Corp.*, 307 F.3d 672, 677 (7th Cir. 2002)**. To this end, the plaintiff may show: "(1) the proffered reasons are factually baseless, (2) the proffered reasons were not the actual motivation for the discharge, or (3) the proffered reasons were insufficient to motivate the discharge." ***Id., citing Koski,* 307 F.3d at 677**.

Trevathan asserts that there is sufficient evidence to show that URS's proffered reason is pretextual – and, essentially, that the evidence more than meets the test, in that the proffered reason is factually baseless, not the actual motivation for his discharge *and* insufficient to motivate his discharge. He contends that URS treated similarly situated employees differently and that employees who willfully or blatantly disregarded safety - but were not injured - were not discharged. As examples, Trevathan offers a list of employees who, between February 2009 and January 2011, violated URS's fall protection policy and were given verbal warnings or suspended. *See* Doc. 53-10. Violation of the project fall protection policy was number one among the 17 safety rules for which there was zero tolerance and for which a worker would be shown the path to the gate. A list of workers who were disciplined for working without correct tie-off procedures and failing to correct the situation showed that 19 employees were suspended on February 2, 2011. As Trevathan points out, fall protection was a serious concern on the job site, and posters there warned, "Think Fall Protection is a Pain … TRY HITTING CONCRETE AT 60 MPH" and "A fall from any height can kill."

In June 2011, an incident occurred in which five employees were suspended when they took all of the ties out of a concrete form and let it drop about 20 feet to the ground. They were disciplined because the "working process caused a potential for serious or fatal injury to personnel." In another instance, an employee who failed to tie-off but was uninjured was given a verbal warning. Two days later, the same employee engaged in horseplay. Both failure to use fall protection and engaging in horseplay are terminable violations under the 17 Rules, but two incidents in three days resulted in nothing more than a second verbal warning.

URS asserts that the incidents cited by Trevathan occurred prior to the implementation of the "Sweet Seventeen Paths to the Gate."  But Trevathan provides evidence that the "Sweet Seventeen" did not announce a new, more onerous policy as to willful or blatant disregard for safety.  According to James Beckerle, who was the deputy project manager at Olmsted, an employee who engaged in willful or blatant disregard for safety could be immediately discharged before the "Sweet Seventeen" was implemented.[2]  Doc. 53-1, Beckerle Dep. 38:6-11.  Moreover, the disciplinary policy as to "willful or blatant disregard" does not differ from that in the Safety Handbook given to Trevathan when he began work for URS, effective as of January 2002.  Lastly, URS continued to discipline employees who violated safety rules, but who did not exercise their rights under the IWCA, less severely than Trevathan.  Bowman Dep., Exh. 1.

URS also argues that the employees identified by Trevathan are not similarly situated because none of them were involved in the same conduct for which he was terminated.  URS submits that Larrison, the employee who was engaged in *exactly* the same conduct, was also terminated.  In this, URS misstates the standard for similarly situated.  As the Seventh Circuit observed earlier this year,

> Comparators must have "engaged in similar—not identical—conduct to qualify as similarly situated." *Peirick [v. Indiana University,* 510 F.3d 681, 691 (2007)] (reversing summary judgment in relevant part; university tennis coach "accused of using abusive language, unsafe driving, leaving students behind during a road trip, and pitting the students against the administration" was similarly situated to coaches who "did not engage in the exact same misconduct" but who "violated the very same rules"), quoting *Ezell v. Potter,* 400 F.3d 1041, 1050 (7th Cir. 2005) (reversing summary judgment in relevant part; mail carrier accused of taking too long a lunch was similarly situated to another carrier who had lost a piece of certified mail). To determine "whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct

---

[2] Beckerle was employed by Alberici Constructors, Inc., which was involved in a Washington Group/Alberici joint venture.  URS had purchased Washington Group.  Beckerle Dep. 6:7-17.

of comparable seriousness." *Peirick,* 510 F.3d at 689.  **Coleman v. Donahoe, 667 F.3d 835, 850-51 (7th Cir. 2012)**.

It is URS itself that has set the standard for "comparable seriousness."  In its list of 17 rule violations, those who failed to wear fall protection or engaged in horseplay have engaged in comparably serious conduct and are, consequently, similarly situated to those who show willful or blatant disregard for safety.

Summary judgment is not warranted because sufficient evidence exists that URS disciplined similarly situated employees - who violated safety rules but who were not injured and did not exercise their rights under the IWCA – differently from the way URS disciplined Trevathan.  Whether Trevathan's conduct meets the standard of "willful or blatant disregard" is also a question for the trier of fact.  Stated another way, the Court cannot find on the evidence before it that URS was not improperly motivated when it discharged Trevathan such that URS would be entitled to judgment as a matter of law.

On the issue of punitive damages, "Illinois law ... draws a clear distinction between the showing needed for liability and the higher level of culpability needed to sustain an award of punitive damages in retaliatory discharge cases….  To recover punitive damages, a plaintiff must present evidence that the underlying conduct ... involve[d] an element of outrage similar to that found in crime."  **Kirchner v. Sunbelt Rentals, Inc. 2011 WL 1303997, at \*4 (N.D.Ill. 2011) (citations, internal citations and quotation marks omitted)**; **Hiatt v. Rockwell Intern. Corp. 26 F.3d 761, 766 (7th Cir. 1994)**.  Although a close call, careful scrutiny of the record shows that Trevathan has provided sufficient evidence to demonstrate that a genuine fact question exists on his eligibility for punitive damages.  The timing of his discharge, coupled with

the other evidence described above, supports a finding of a higher level of culpability such that summary judgment on the punitive damages claim is not warranted.

IV. Conclusion

For the foregoing reasons, the Court **DENIES** URS's motion for summary judgment (Doc. 33). This case remains set for Final Pretrial Conference on November 16, 2012, at 11:00 a.m., with a Jury Trial set for November 26, 2012, at 9:00 a.m.

IT IS SO ORDERED.

DATED this 17th day of October, 2012

s/Michael J. Reagan
MICHAEL J. REAGAN
United States District Judge